# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| SAM BRANUM on behalf of himself and others similarly situated | ) | |
| | ) | |
| | ) | |
| **Plaintiff** | ) | Case No. _____ |
| | ) | |
| v. | ) | **Jury Trial Demanded** |
| | ) | |
| MONSANTO COMPANY | ) | |
| | ) | |
| **Defendant** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, who brings Counts I – IV individually and on behalf of all others similarly situated, and Count V individually against Monsanto Company, states as follows:

## NATURE OF THE ACTION

Plaintiff brings this antitrust action on behalf of himself and a class of direct purchasers of Monsanto's genetically modified trait in soybeans and cotton at prices artificially inflated because of an anticompetitive scheme by Monsanto and its conspirators. Monsanto has long held dominance and monopoly power in genetically modified seed traits. Beginning in or around 2008 and continuing to present, Monsanto carried out a plan to develop, license and sell a genetic trait conferring resistance to dicamba, a dangerous herbicide known to be not only highly damaging to susceptible non-resistant crops, including soybean and cotton, but also highly volatile and prone to move off target. Monsanto alone, and with the aid of its conspirators, succeeded and will continue to succeed in intimidating farmers into buying the technology in order to avoid crop damage, thus suppressing and eliminating competition and obtain artificially high prices. All

direct purchasers of Monsanto's technology were injured by the amount of price impact resulting from the anti-competitive conduct described herein.

## PARTIES

1.     Plaintiff Sam Branum is a Missouri resident who farms crops, including soybeans, in Missouri.

2.     Defendant Monsanto Company ("Monsanto") is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri. Monsanto develops, manufactures, licenses, and sells agricultural biotechnology, agricultural chemicals, and other agricultural products, including herbicides and seed genetically modified to produce crops resistant thereto. These include Roundup Ready 2 Xtend Soybean ("Xtend soybeans"), Bollgard II XtendFlex cotton ("XtendFlex cotton") and a herbicide known as XtendiMax with VaporGrip Technology®.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (actions arising under statutes regulating commerce or protecting against restraints and monopolies) and 28 U.S.C. § 1331 (federal question) as the claims herein arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Section 4 of the Clayton Act (15 U.S.C. § 15) thus involving questions of federal law. The Court has supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367(a).

4.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district and/or pursuant to 28 U.S.C. §1391(b) and 15 U.S.C. § 22 because Monsanto resides in, may be found in, and also transacts business in this district.

5.    Monsanto, whose headquarters and principal place of business, is in this district, resides in, may be found in, and/or transacts business in this district.  Monsanto's business in this district includes development, marketing, licensing, and selling Xtend seed products as well as dicamba XtendiMax herbicide.  Monsanto, the only biotechnology company to have developed and commercialized (to date, soybean and cotton) seed genetically modified for resistance to dicamba, also has entered into agreements with BASF Corporation ("BASF") and E.I. DuPont De Nemours and Company ("DuPont") or their affiliates for the marketing and sale of a dicamba-based crop system dependent upon such seed and designed for in-crop application of dicamba herbicide sold by Monsanto, BASF, and DuPont.

6.    As more fully described herein, Monsanto and BASF have since at least 2009 engaged in a joint venture to develop technologies for a dicamba-based crop system, for which they fund projects jointly and share profits.  They collaborated in developing dicamba formulations for application over the top of growing plants, entered into reciprocal licensing arrangements, engaged in joint field testing, collaborated on stewardship guidelines, and worked jointly in developing and marketing the dicamba-based weed control system at issue. On information and belief, a substantial portion of negotiations and activities relating to these agreements occurred in this district.  BASF markets and sells its dicamba herbicide Engenia only for use with Monsanto's Xtend seed technology.

7.    As more fully described herein, Monsanto and DuPont have entered into one or more agreements under which DuPont utilizes, markets and sells Monsanto's genetic trait conferring dicamba resistance.  DuPont itself or through its affiliate, Pioneer Hi-Bred International ("Pioneer") sells soybean seed with Monsanto's Roundup Ready 2 Xtend® dicamba-resistant technology.  Monsanto and DuPont also have entered into one or more agreements under which

3

DuPont utilizes, markets, and sells dicamba herbicide for in-crop use containing Monsanto's "VaporGrip Technology®" under DuPont's trade name FeXapan. On information and belief, a substantial portion of negotiations and activities relating to these agreements occurred in this district. DuPont markets and sells its dicamba herbicide FeXapan only for use with Monsanto's Xtend seed technology.

8.    Monsanto itself markets, distributes and sells Xtend seed, as well as XtendiMax herbicide, in this district.

9.    This Court has personal jurisdiction over Monsanto pursuant to 15 U.S.C. § 22, as it inhabits, may be found and/ or transacts business in this district and also has jurisdiction because Monsanto carries on systematic, continuous and substantial business in Missouri, is at home in Missouri, and further, has transacted business, made contracts, committed a tort and anti-trust violations within and having injury in Missouri from which the claims herein arise.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### *Monsanto's Dominance with Roundup Ready Seed*

10.    Monsanto is engaged in interstate commerce and activities substantially affecting interstate commerce. It is the leading supplier of agricultural products, including biotechnology traits, seeds, and crop protection products, with licenses to other companies and customer sales throughout the United States.

11.    Monsanto was one of the first companies to utilize biotechnology in the field of agriculture, and has become a leading producer of genetically modified seed and agro-chemicals.

12.    Biotechnology has made possible the introduction of genetic characteristics, or traits, into plant seeds. Among the most widely used genetically modified traits is herbicide resistance.

13.     In the 1970s, Monsanto patented the glyphosate molecule, which became the main ingredient in Roundup herbicide sold by Monsanto.

14.     Glyphosate is a non-selective herbicide that causes severe injury or destruction to plants, including soybean and cotton, that have not been genetically modified to tolerate it.

15.     Once absorbed by a plant, glyphosate binds to and blocks the activity of a key enzyme (enolpyruvylshikimate-3-phosphate synthase) and inhibits the function of the shikimic acid pathway causing a deficiency in aromatic amino acids, eventually leading to the plant's death by starvation.

16.     Introduced in 1974, Roundup became one of the world's most widely used herbicides.

17.     Monsanto also genetically engineered seed to withstand glyphosate, sold by Monsanto under the brand name Roundup Ready ("RR").

18.     It was Monsanto's development and sale of the glyphosate-tolerant trait that changed how farmers could apply glyphosate herbicide.  Rather than being applied only before the crop is planted (in the "burn-down" stage), the glyphosate in Roundup can be sprayed over the top of growing crops genetically modified to withstand it.  As a result, farmers planting glyphosate-tolerant crops can apply it over an entire field, after the crop has emerged without damage to the crop itself.  Over-the-top application of glyphosate is now commonplace.

19.     Monsanto's Roundup herbicide and RR seed each supported the other, becoming a blockbuster combination.

20.     Glyphosate use in the U.S. rose from 12.5 million pounds in 1995 to 250 million pounds in 2014.  Science Daily, *Monsanto's glyphosate now most heavily used weed-killer in history* (Feb. 2, 2016), www.sciencedaily.com/releases/2016/02/160202090536.htm.

5

21.    The glyphosate-resistant trait is a technology that Monsanto patented, owns and licenses.  A farmer cannot obtain that trait without buying the seed into which it has been inserted.

22.    Herbicide-tolerant traits in crop seed such as soybeans and cotton are each a line of commerce or relevant product market within antitrust laws.  There is no substitute for herbicide-tolerant traits, which provide a foundation for unique product lines.

23.    Monsanto began selling RR soybean seed in 1996 and RR corn seed in 1998.  Other crops genetically altered to withstand glyphosate Roundup herbicide include canola, cotton, alfalfa, and sugar beets.

24.    An overwhelming majority of major crops in the United States are genetically modified, and Monsanto controls the overwhelming majority of herbicide resistance.

25.    There are substantial barriers to entry into the herbicide-tolerant trait market, including the significant time and expense to develop those traits and obtain necessary regulatory approvals.  It has been reported that the cost of discovery, development, and authorization of a new plant biotechnology trait introduced between 2008 and 2012 was $135 million, with an average 13.1 years from discovery to commercial launch.  *See* CropLife International, *Cost of Bringing a BioTech Crop To Market* (Nov. 7, 2011), https://croplife.org/plant-biotechnology/regulatory-2/cost-of-bringing-a-biotech-crop-to-market/.

26.    In addition, there is high concentration in GM seed and crop protection.  Only a handful of firms (known as the "Big Six") dominate private-sector research on both seeds and crop-protection chemicals.  Genetically modified seed encourages use of the herbicide to which it is tolerant and this close relationship "may encourage combination and linked pricing of seeds and chemicals."  James M. MacDonald, USDA Economic Research Service, *Mergers and Competition in Seed and Agricultural Chemical Markets* (April 03, 2017), https://www.ers.usda.gov/amber-

waves/2017/april/mergers-and-competition-in-seed-and-agricultural-chemical-markets/. These companies also have engaged in cross licensing including GM seed with combined ("stacked") traits. "The effect is similar to the formation of a cartel to exclude other potential competitors." Henry Bryant et al., *Effects of Proposed Mergers and Acquisitions Among Biotechnology Firms on Seed Prices* at 14 (Agricultural and Food Policy Center Texas A&M University, Working Paper No. 16-2, Sept. 2016), https://www.afpc.tamu.edu/research/publications/files/675/WP_16-2.pdf. "Monsanto has a central position in this network." *Id.* at 10. Moreover, Monsanto has erected significant barriers to entry by conduct including but not limited to restrictive seed trait licensing agreements.

27.    Concentrated markets are more conducive to the exercise of market power than when not concentrated. An article published by the USDA Economic Research Service explains: "At low levels of concentration, when they face many competitors, firms have little control over prices. If a single firm attempts to raise the price for its seeds or chemicals, farmers would be able to quickly switch to rival sellers, and the firm would lose so much business that the price increase would result in reduced revenues and profits. However, at higher levels of concentration, with only a few rivals in a market, farmers have fewer alternatives if a seller raised seed or chemical prices." James M. MacDonald, USDA Economic Research Service, *Mergers and Competition in Seed and Agricultural Chemical Markets* (April 03, 2017), https://www.ers.usda.gov/amber-waves/2017/april/mergers-and-competition-in-seed-and-agricultural-chemical-markets/.

28.    As reported before the Senate Judiciary Committee in 2016, "[r]elative to other agricultural input sectors, the level of concentration and increases to concentration over time are the highest in crop seed. For example, the market share of the four largest firms [Monsanto ($16 billion), Syngenta ($14 billion), Bayer ($12 billion), and DuPont ($11 billion)], more than doubled

to 54% between 1994 and 2009. In 2007, the four largest companies accounted for an estimated 72% of the U.S. market for corn seed and 55% of soybean seed, with Monsanto's share in corn and soybeans close to 65%. In 2009, the top four companies held 95% of the U.S. market for cotton seed, with Monsanto and Bayer accounting for the lion's share. In the traits market in 2009, the Big 6 [Monsanto, Syngenta, Bayer, DuPont, Dow, and BASF] held greater than 95% of trait acres for corn, soybeans and cotton in the U.S., with Monsanto alone accounting for 90% of these acres." Testimony of Diana L. Moss, Ph.D., President, American Antitrust Institute, before The Senate Judiciary Committee "Consolidation And Competition in the U.S. Seed and Agrochemical Industry" at 4-5 (Sept. 20, 2016), https://www.judiciary.senate.gov/imo/media/doc/09-20-16%20Moss%20Testimony.pdf.

29.     With recent acquisitions and potential acquisitions, including a proposal by Bayer to acquire Monsanto, and to spin off its LibertyLink (glufosinate tolerant) seed and herbicide business to BASF, this concentration will only grow tighter.

30.     Monsanto has long sought dominance and control through a number of devices, including intensive acquisition of seed companies. As to germplasm alone, Monsanto, by at least 2016, reported a 40% market position in soybeans and cotton in the U.S. *See* Monsanto Whistle Stop Tour "Accelerating the Future of Agriculture" Day 1 Session (Aug. 17, 2016), https://monsanto.com/app/uploads/2017/05/whistle_stop_viii_day-1-session_materials.pdf.

31.     And Monsanto has dominated the market for herbicide-tolerant traits, including soybean and cotton, with its RR technology.

32.     By 2015, almost all corn, cotton, and soybean acres in the United States were planted with transgenic varieties (92%, 94% and 94%, respectively). Testimony of Diana L. Moss, Ph.D, President, American Antitrust Institute, before The Senate Judiciary Committee

"Consolidation And Competition In The U.S. Seed And Agrochemical Industry" (Sept. 20, 2016) at 3. More than 90% of soybeans and approximately 80% of corn and cotton are grown with seed containing Monsanto's RR trait.

33. Until 2015, Monsanto held the patent on its "first generation" Roundup Ready ("RR1") trait.

34. Monsanto describes the original RR1 soybean as "the world's most widely adopted biotech trait, planted by farmers on billions of acres since 1996." Monsanto News Release, Roundup Ready Soybean Patent Expiration (April 9, 2017), monsanto.com/company/media/statements/roundup-ready-soybean-patent-expiration/.

35. Well before the RR1 patent expired in 2015, Monsanto patented a "second generation" Roundup Ready ("RR2") trait, which expresses the same enzyme that confers glyphosate resistance as RR1.

36. According to Monsanto, "[f]armers have planted more than 50 million acres of the second-generation trait since it launched in 2009." *Roundup Ready Soybean Patent Expiration* (April 9, 2017), https://monsanto.com/company/media/statements/roundup-ready-soybean-patent-expiration/.

37. Farmers who purchase seed containing Monsanto GM trait technology are direct purchasers of that technology.

38. Monsanto requires all farmers who purchase seed containing its technology to sign a Monsanto Technology/Stewardship Agreement ("MTSA") and pay a fee for the technology.

39. According to Monsanto policy, "seed containing Monsanto patented technologies can be sold only to growers who are properly licensed." Seed containing that technology, including the dicamba-resistant Xtend technology "can only be sold to growers who have a current,

9

active,   signed   MTSA."   Monsanto   Seed   Dealer   Stewardship   Policy, https://monsanto.com/app/uploads/2017/05/2016-trait-stewardship-policy.pdf.

40.    The MTSA is a limited use license that allows growers to access Monsanto patented traits and germplasm. *Id.*

41.    Monsanto requires that the grower sign the agreement and be licensed prior to delivery of the seed. *Id.*

42.    Farmers must pay a technology fee to Monsanto for the genetically modified trait in addition to the price of base germplasm of the seed.  Among other things, the 2017 MTSA provides that the farmer agrees

> [t]o pay all applicable royalties and technology fees for the use of the Monsanto Technologies and applicable fees due Monsanto that are part of, associated with the Seed purchase price or that are invoiced for the Seed. If Grower fails to pay Monsanto or any wholly owned Monsanto subsidiaries, for costs of Seed, Monsanto Technologies, and/or royalties, Grower agrees to pay Monsanto default interest charges at the rate of 18% per annum (or the maximum allowed by law whichever is less) plus reasonable attorneys' fees, court costs and all other costs of collection . . . .

43.    In addition, the farmer agrees that he will not save or plant seed containing Monsanto technology.  Rather, the farmer must purchase new seed every year.

44.    Seed companies also must obtain licenses to utilize Monsanto's RR technology, including if they want to combine ("stack") it with other traits as, for example, insect resistance or enhanced nutritional value, giving Monsanto huge market power.

45.    Jim Denvir, a lawyer for DuPont, was quoted in January 2010 as saying: "Farmers will not buy soybeans without Roundup Ready in it. So, that gives Monsanto an amazing amount of leverage." Frank Morris, *Monsanto GMO Ignites Big Seed War* (Jan 12, 2010), www.npr.org/templates/story/story.php?storyId=122498255.

46.     According to Mr. Denvir, "[a] seed company can't stay in business without offering seeds with Roundup Ready in it, so if they want to stay in that business, essentially they have to do what Monsanto tells them to do." *Id.*

47.     Monsanto uses licensing to spread its technology and penetrate the market. It also uses licensing agreements to control what traits other companies can use, and can stack with the RR trait.

48.     In 2009, Monsanto sued to stop DuPont and Pioneer from stacking Monsanto's RR trait with Pioneer's Optimum® GAT® trait for tolerance to ALS herbicides. This combination was to provide farmers with an option against glyphosate-resistant weeds. *See* DuPont News Release, DuPont Names Glyphosate, ALS Tolerant Trait Optimum GAT (March 2, 2006), http://www2.dupont.com/Media_Center/en_US/news_releases/2006/article20060302c.html.

49.     Dupont / Pioneer is a leading developer, producer, and marketer of soybean and corn seed, and historically, a competitor of Monsanto both as a developer of seed varieties and a developer of genetic traits.

50.     In July 2009, Pioneer counterclaimed against Monsanto, alleging that Monsanto engaged in numerous anti-competitive acts in order to acquire, protect and expand its monopoly power in the soybean and corn herbicide-tolerant markets. *See* Defendants' Amended Answer and Counterclaims, *Monsanto Co. v. E.I.Dupont De Nemours and Co.*, No. 409CV00686, 2009 WL 2589331 (E.D. Mo. July 10, 2009) ("Counterclaim").

51.     Pioneer alleged that Monsanto "is the dominant supplier of herbicide resistant soybean traits in the United States with a market share of approximately 99.7%" and "virtually a complete monopoly" of this market, "including the power to control prices and exclude competition." *Id.*, Counterclaim ¶ 25.

52.     Other sources have estimated Monsanto's market dominance in genetic traits to be, as of 2009, 97% (herbicide and insect tolerance) for soybeans, 95% for cotton, and 75% for corn. Diana L. Moss, American Anti-Trust Institute, *Transgenic Seed Platforms: Competition Between a Rock and a Hard Place?* at 5 (April 5, 2010), https://www.antitrustinstitute.org/sites/default/files/Addendum%20to%20AAI%20White%20Paper_Transgenic%20Seed.4.5_040520101107.pdf.   That dominance has not lessened over time.

53.     In comments to the Justice Department, DuPont stated that "[t]he ag biotech trait market is firmly in the grip of a single supplier, acting as a bottleneck to competition and choice." Comments of DuPont/Pioneer Regarding Agriculture and Antitrust Enforcement Issues in Our 21st Century Economy, https://www.justice.gov/sites/default/legacy/2010/03/04/254990.pdf.

54.     As asserted by Pioneer in its counterclaim, Monsanto uses stringent provisions in its licensing agreements to stifle competition, including requiring independent seed companies to switch to RR2 before the RR1 Patent expired thus suppressing competition on the original technology, preventing other companies from combining any non-Monsanto traits with Monsanto traits, and preventing independent seed companies from incorporating competing traits into their own breeding programs.  *See* 2009 WL 2589331 (Counterclaim); *see also AP: Monsanto Strong-Arms Seed Industry*  (Dec. 14, 2009), https://www.cbsnews.com /news/ap-monsanto-strong-arms-seed-industry/ (while Monsanto licenses its technology to other companies, which not only spreads the technology but commands a royalty, its contracts "ban[] independent companies from breeding plants  that contain both Monsanto's genes and the genes of any of its competitors, unless Monsanto gives prior written permission - giving Monsanto the ability to effectively lock out competitors from inserting their patented traits into the vast share of U.S. crops that already contain Monsanto's genes").

55.    In markets that are competitive, technologies that enjoy widespread adoption typically experience a decline in prices; the opposite is true for genetically modified crops.   In its claims against Monsanto, for example, DuPont pointed out that during 2002 – 2006 alone, the price of the RR trait in soybeans increased 118%, and during 2004 - 2008, the price of the RR trait in corn seed prices increased 100%.  *See* 2009 WL 2589331, Counterclaim ¶ 54.

56.    In 2009, Neil Harl, an agricultural economist at Iowa State University, opined that the extent of Monsanto's level of control of seed genetics "is almost unbelievable," and "[t]he upshot of that is that it's tightening Monsanto's control, and makes it possible for them to increase their prices long term. And we've seen this happening the last five years, and the end is not in sight."  *AP: Monsanto Strong-Arms Seed Industry* (Dec. 14, 2009), https://www.cbsnews.com /news/ap-monsanto-strong-arms-seed-industry/.

57.    Charles Benbrook, research professor at Washington State University's Center for Sustaining Agriculture and Natural Resources, estimated that from 2000 to 2010 as genetically modified soybeans came to dominate the market, the price for seed increased 230 percent. The cost for Monsanto's RR2 soybeans in 2010 was $70 per bag, a 143 percent increase in the price of GE seed since 2001. Ken Roseboro, *The GMO Seed Monopoly: Fewer Choices, Higher Prices* (Oct. 4, 2013), http://www.fooddemocracynow.org/blog/2013/ oct/4/the_gmo_seed_monopoly_fewer_choices_higher_prices.  As one farmer succinctly described it: "Ever since [Monsanto came] out with the Roundup Ready trait and that became popular and basically took over farming, we've seen significant increases every single year." Frank Morris, *Monsanto GMO Ignites Big Seed War* (January 12, 2010), https://www.npr.org/templates/story/story.php?storyId=122498255.

58.    Monsanto charges more for its RR2Yield soybean seed than its original RR1 soybean seed, marketing it as having better yield, which it does not as compared to RR1 and/or other varieties.

***Glyphosate Resistance and Development of Dicamba- Resistant Seed***

59.    As a result of the widespread use of glyphosate, made possible and encouraged by Monsanto's RR seed trait, weeds have evolved to become naturally resistant to glyphosate. These glyphosate-resistant weeds are known as "super weeds."

60.    According to a survey by Stratus Agri-Marketing in 2012, the area of U.S. cropland infested with glyphosate-resistant weeds was 61.2 million acres. Weeds resistant to glyphosate are now found on at least half of all U.S. cropland.

61.    Recognizing the opportunity to protect and enhance its RR dominance, as well as to capitalize on and monopolize the market with a new trait to address the weed problem its RR products produced, Monsanto, with the aid of BASF, set out to develop a crop system featuring dicamba, an exceptionally volatile and damaging herbicide.

62.    Dicamba is a broad-spectrum systemic herbicide that destroys broadleaf weeds and plants.

63.    Dicamba mimics the plant hormone auxin, causing uncontrolled cell division and growth, causing the plant to grow so fast that it cannot retain the nutrients it requires, which kills the plant.

64.    Certain plants are extremely sensitive to dicamba, even in trace amounts, including soybeans and cotton.

65.    A healthy soybean plant will produce fully-developed pods and leaves throughout the stem of the plant. A soybean plant damaged by dicamba suffers significant loss of pods

throughout the stem, reduced number of beans per pod, and discoloration and cupping of the leaves of the plant.

66.    Dicamba also has long been recognized as extremely volatile, meaning that it has a high propensity to evaporate from the soil and/or plant surface and then move as vapor through the air to other plants. Vaporized dicamba can travel great distances before falling onto and damaging desirable off-target plants, including non-resistant crops.

67.    In addition, dicamba's volatility is long-lived, meaning longer exposure for non-tolerant plants and increased risk of movement.

68.    Dicamba not only is very volatile, but very prone to physical drift.  Physical drift, as opposed to volatilization, is movement of spray droplets to non-target areas. Such drift can be influenced by weather, wind speed and direction, droplet size and ground speed or spray pressure.

69.    Even a very small amount of drift can result in extensive damage to susceptible non-resistant crops. It has been estimated that while one-eighth of a quart of glyphosate "will cause 20 percent damage to susceptible vegetation . . . you get 20 percent damage at one-fifteen-hundredth of a pint of dicamba."  According to Larry Steckel, a weed scientist from Tennessee, "[t]hat's a game changing difference."  Elton Robinson, *New Herbicide Tech Demands New Nozzle Thinking – 10 Quick Points*, http://agfaxweedsolutions.com/2017/01/12/new-herbicide-tech-demands-new-nozzle-thinking-10-quick-points/ (last visited Dec. 19, 2017).

70.    Dicamba has been on the market in various forms since the 1960s for use in pre-planting or post-harvest burndown. Because there are typically no neighboring crops to damage during burndown, it is relatively safe to apply even highly volatile chemicals, such as dicamba, during this stage.

71.    The new dicamba-based crop system, however, would involve spraying this highly volatile, drift-prone, and damaging herbicide over the top of growing plants.

72.    BASF is one of the world's leading chemical companies and original inventor of dicamba.  It historically has competed with Monsanto in at least crop protection products.

73.    From at least 2008, Monsanto began development of seed genetically modified to provide tolerance not only to glyphosate, but also to dicamba.

74.    Monsanto also entered into agreements with competitors, including BASF and DuPont, to create, accelerate, and promote a dicamba-based crop system, with its own dicamba-resistant trait as the centerpiece.

75.    It is well known to agro-chemical companies like Monsanto, BASF, and DuPont that dicamba not only is volatile and drift-prone but has extreme negative effects on desirable broad-leaf plants, including trees, fruits, vegetables, and various crops, especially soybeans.

76.    Monsanto's development of a genetically engineered trait of resistance to dicamba, and the spraying of dicamba over the top of crops after emergence from the ground, meant that dicamba would be sprayed much later in the year than before – in months that are hot and humid – and in the vicinity of susceptible non-resistant crops also emerging and at high risk for damage by dicamba.

77.    Monsanto, along with BASF and DuPont, each under agreement with Monsanto, proceeded to release and promote a dicamba-based crop system substantially certain to harm those crops and, as a result, pressure farmers to purchase Monsanto's dicamba-resistant trait.

78.    Monsanto entered into agreements with BASF to develop and market the dicamba-based crop system, consisting of the dicamba-resistant trait to be supplied by Monsanto, and in-crop dicamba herbicide to be supplied by both Monsanto and BASF.

79.     In or prior to 2009, Monsanto and BASF entered into one or more agreements to collaborate and accelerate new traits and products, under joint budget and with profits from commercialized products shared, with Monsanto receiving 60% of net profits.

80.     In January 2009, Monsanto and BASF announced a joint-licensing agreement to accelerate use of dicamba-based weed control products, both participating in development of formulations of dicamba to be used with Monsanto's dicamba-resistant seed trait.

81.     In a joint press release on November 2, 2010, Monsanto and BASF announced "significant progress toward launching next-generation dicamba-based weed control systems for soybeans and cotton." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

82.     In joint press releases Monsanto and BASF stated that they had agreed to "collaborate on the advancement of dicamba tolerant cropping systems. The companies have granted reciprocal licenses and BASF has agreed to supply formulated dicamba herbicide products to Monsanto." *See* Joint Press Release, *BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level* (March 14, 2011), https://monsanto.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level/.

83.     Robb Fraley, Monsanto's chief technology officer, stated: "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market." *Id.*

84.    Monsanto and BASF conducted joint field testing of dicamba-based formulations applied over the top of Monsanto's dicamba-tolerant soybean technology in development, and also said their collaboration included joint development of stewardship, education programs and best practices to "support long term sustainability" of a dicamba-tolerant system. Monsanto and BASF Yield-and-Stress Collaboration Field Tour Monmouth Research Facility, August 8, 2011, PowerPoint,        https://www.basf.com/documents/corp/en/investor-relations/calendar-and-publications/calendar/2011/roundtable_agricultural/ 110808_Agro_Roundtable_2011_Tour.pdf.

85.    Among concerns expressed early on, scientists from Ohio State University addressed a conference in Columbus in October 2011 focused on dicamba.  Representatives of Monsanto and BASF were in attendance. Douglas Doohan, a conference organizer, and his colleagues outlined the risk of unapproved spraying of older dicamba versions when dicamba-resistant seed became available and also that damage to other crops would lead farmers to buy dicamba-tolerant seed to protect themselves. Emily Flitter, Reuters, The story behind Monsanto's       sprawling       herbicide       crisis       (Nov.       10,       2017), http://www.provmweb.com/news/a05a1/www.provmweb.com/news/a05a1/the-story-behind-monsantos-sprawling-herbicide-crisis.

86.    On April 29, 2010, Monsanto applied to the Environmental Protection Agency (EPA) for registration of M-1691 Herbicide, a diglycolamine (DGA) salt of dicamba (a formulation previously sold by BASF as Clarity herbicide), supposedly less volatile than older formulations.  On July 30, 2012, Monsanto applied for EPA registration of M-1768 Herbicide, again a DGA dicamba salt, this time with Monsanto's "VaporGrip® Technology" that supposedly further lowered volatility, for use post-emergence, or over-the-top, of genetically-modified, dicamba-resistant soybeans and cotton.

18

87.     Monsanto, which provided the EPA only with its own volatility studies, refused independent volatility testing of XtendiMax with "VaporGrip Technology." Monsanto repeatedly denied university requests to research volatility of the herbicide.  While Monsanto did provide samples of XtendiMax to various universities, including the University of Missouri and the University of Arkansas, the samples came with contracts containing never-before-seen strict constraints which expressly prohibited volatility testing.

88.     The new dicamba formulations otherwise were not adequately tested for sufficient time or under real-world conditions in areas in which they would be sold.  Among other things, Monsanto field tested its "VaporGrip Technology" in only two locations – Texas and Georgia – involving specific soil types, only a few acres, and a limited time span.  There was no modeling of large-scale spraying.

89.     In August 2012, a jury awarded Monsanto a $1 billion verdict on its claims against DuPont for patent infringement.  Shortly thereafter, however, and with DuPont's anti-trust claims still pending, Monsanto and DuPont announced in 2013 that they would resolve their respective lawsuits and enter into a deal under which Monsanto would waive the verdict and DuPont would dismiss its anti-trust claims and pay some $1.75 billion in royalties in exchange for access to Monsanto's genetic technology, including RR and dicamba resistance.

90.     Monsanto entered into technology licensing agreements with DuPont under which DuPont could market and sell soybean seed containing Monsanto's RR2Yield, as well as Monsanto's dicamba resistance technology.  Joint Press Release, *DuPont and Monsanto Reach Technology Licensing Agreements on Next-Generation Soybean Technologies* (March 26, 2013), https://www.pioneer.com/home/site/about/news-media/news-releases/template.CONTENT/ guid.EAB5E402-FECE-0123-144E-CBC62A6D8513.

91.     Brett Begemann, Monsanto president and chief commercial officer, stated that the agreement "signals a new approach to our companies doing business together . . . ."  Andrew Pollack*, Monsanto and DuPont Settle Fight Over Patent Licensing* (March 26, 2013), http://www.nytimes.com/2013/03/27/business/monsanto-and-dupont-settle-fight-over-roundup-ready-technology.html.

92.     As of 2014, DuPont had begun "[r]apid integration of Roundup Ready 2 Xtend into Pioneer germplasm."  DuPont Power Point Presentation at 15,  https://s2.q4cdn.com/752917794/files/doc_presentations/2014/2014-Goldman-Sachs-Presentation-FINAL.pdf      (last visited Jan. 3, 2018).

93.     Monsanto also entered into agreements with DuPont under which DuPont could utilize, market, and sell dicamba herbicide for in-crop use containing Monsanto's "VaporGrip Technology."

94.     Monsanto, BASF and DuPont all aggressively marketed what would become the RR Xtend Crop System ("Xtend Crop System").

95.     Monsanto's dicamba-resistant trait in soybean and cotton seed was deregulated by the USDA on or about January 14, 2015, meaning no further regulation by that agency and that Monsanto could commercialize seed containing that trait.

96.     The price of seed containing the genetic modification for dicamba resistance is more than seed without it.  For example, included among Monsanto's "Key Metrics and Platform Drivers" is that its Xtend technology would carry a $5-10/acre premium over RR2Yield varieties. *See* Robb Fraley Citi's 2015 Basic Material Conference (Dec. 2, 2015), https://monsanto.com/app/uploads/2017/05/citi_fraley_2015.12.02.pdf; Monsanto Company Fourth

quarter      FY      2016      Earnings      Call      (Oct.      5,      2016),
https://monsanto.com/app/uploads/2017/05/2016.10.5_MON_Q4F16_Financial_Results.pdf.

97.    There is no benefit to the Xtend trait other than resistance to dicamba, and no benefit to dicamba resistance other than use of dicamba herbicide.

***Dicamba Damage in 2015 and 2016***

98.    As of 2015, there was no registration from the EPA for any "low" volatility dicamba for use over the top of growing plants.

99.    Nevertheless, Monsanto commercialized its XtendFlex cotton for the 2015 growing season.  Monsanto rolled out its new XtendFlex cotton despite lack of approval for over-the-top dicamba.

100.    Monsanto had been touting the supposed benefits of the Xtend Crop System for years, and aggressively promoted the new cotton seed.

101.    Monsanto's public stance was that the older-version dicamba herbicides were not to be used over-the-top.  Monsanto representatives, however, advised farmers to do just the opposite – to spray existing dicamba products over the top of their crops in 2015.

102.    Foreseeably, and as predicted, farmers did spray the older versions and damage to non-resistant crops occurred.

103.    Monsanto then commercialized its genetically modified dicamba-resistant RR2 Xtend soybeans for the 2016 growing season.

104.    As with Monsanto's 2015 release of XtendFlex cotton, there was no dicamba herbicide approved for over-the-top use in 2016.

105.    Despite the prior year's experience and damage from XtendFlex cotton, Monsanto proceeded with release of Xtend soybeans for the 2016 growing season, telling farmers that

approval of its new "low" volatility dicamba herbicide was "imminent." Monsanto Q1 2016 Results Earnings Call Transcript (Jan. 6, 2016), https://seekingalpha.com/article/3794576-monsanto-companys-mon-ceo-hugh-grant-q1-2016-results-earnings-call-transcript.

106.    Monsanto even provided a $5/unit price reduction for the Xtend soybeans in 2016 to entice sales. *See* Monsanto Whistle Stop Tour "Accelerating the Future of Agriculture," Day 1 Session (Aug. 17, 2016), https://monsanto.com/app/uploads/2017/05/whistle_stop_viii_day-1-session_materials.pdf

107.    DuPont/Pioneer also launched varieties of soybean with RR2 Xtend technology in 2016.

108.    Again, as in 2015, farmers predictably sprayed older dicamba formulations over the top of dicamba-resistant crops, and again, damage to non-resistant crops occurred in 2016.

109.    Not only did damage again result in 2016, it was on a much larger scale with both Monsanto's Xtend cotton and Xtend soybeans on the market.

***Full-Scale Dicamba-System Rollout in 2017***

110.    EPA registrations for the new dicamba formulations came after harvest in 2016.

111.    In November and December 2016, Monsanto and BASF, respectively, received registrations from the EPA for their dicamba herbicides approved for over-the-top use with Monsanto's Xtend seed technology.

112.    Monsanto began selling its dicamba formulation under the trade name XtendiMax with VaporGrip Technology ("XtendiMax").

113.    BASF began selling its dicamba formulation under the trade name Engenia.

114.    DuPont received EPA registration on or about February 16, 2017, and began selling dicamba herbicide with Monsanto's "VaporGrip Technology" under the trade name FeXapan.

115.    Monsanto's licensing of its "VaporGrip" technology to companies like DuPont also is one of Monsanto's "Key Metrics and Platform Drivers."   *See* Monsanto Fourth-Quarter FY2017 Earnings Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto.com/app/uploads/2017/10/MonsantoCo._Q4F17_Earnings_Presentation_2017. 10.04.pdf.  That licensing, as well as BASF's sales of its own "low" volatility dicamba, were intended to and do further promote Monsanto's penetration of the market and increase sales of the dicamba-resistant trait on which over-the-top use of dicamba herbicide depends.

116.    Notwithstanding multiple warnings from weed scientists and others, and despite the crop damage in 2015 and 2016, Monsanto's much-touted "Xtend Crop System," entailing Monsanto's dicamba-tolerant seed trait and in-crop dicamba herbicide sold by Monsanto, BASF, and DuPont became fully available for 2017.

117.    Monsanto, BASF, and DuPont all market their in-crop dicamba herbicide as part of a crop system featuring Monsanto's dicamba-resistant Xtend seed trait.

118.    Monsanto markets XtendiMax as a low-volatility dicamba formulation with "VaporGrip Technology," designed for use with the dicamba-resistant Xtend seed trait sold and licensed only by Monsanto.

119.    BASF markets Engenia as a low-volatility dicamba formulation designed for use with dicamba-resistant seed trait sold and licensed only by Monsanto, which BASF promotes in its own advertising as "Dicamba-tolerant soybean sold under the trait name Roundup Ready 2 Xtend Soybeans." *Introducing the Most Flexible and Advanced Dicamba for Dicamba-Tolerant Crops*,    http://agproducts.basf.us/campaigns/engenia/assets/pdf/Engenia-Soybeans-National-TIB.pdf (last visited Dec. 19, 2017).

120.    Monsanto and DuPont issued a joint press release in July 2016 regarding their multi-year dicamba supply agreement, which Mike Frank, Monsanto vice president, said "represent[ed] continued commitment to the Roundup Ready® Xtend Crop System." Joint Press Release, *Monsanto and DuPont Sign Dicamba Supply Agreement* (July 7, 2016), http://www.dupont.com/corporate-functions/media-center/press-releases/monsanto-dupont-sign-dicamba-supply-agreement.html (last visited Dec. 19, 2017).

121.    DuPont markets its FeXapan herbicide as a low-volatility dicamba formulation with "VaporGrip Technology" designed for use with dicamba-resistant trait sold only by Monsanto, which DuPont promotes as part of its own advertising as "part of the Roundup Ready 2 Xtend® Acre Solution." FeXapan™ Herbicide Plus Vaporgrip® Technology, http://www.dupont.com/products-and-services/crop-protection/soybean-protection/products/fexapan.html (last visited Dec. 19, 2017).

122.    Monsanto sold and/or licensed, and farmers planted, seed containing Monsanto's dicamba-resistant trait on approximately 25 million acres of soybean and cotton fields in 2017.

123.    Monsanto bred the dicamba-resistant trait into its entire stock of soybeans. *See* Emily Flitter, *Special Report: The decisions behind Monsanto's weed-killer crisis* (Nov. 9, 2017), https://uk.reuters.com/article/uk-monsanto-dicamba-specialreport/the-decisions-behind-monsantos-weed-killer-crisis-idUKKBN1D91Q9.

124.    DuPont offered more than 30 varieties of soybean seed with RR2 Xtend dicamba-resistant technology through its license with Monsanto.

125.    Monsanto, BASF, and DuPont all promoted and represented their supposed "low" volatility dicamba formulations as safe when they are not.

126.    As early as 2010, Monsanto and BASF were representing that they had made "significant progress toward launching next-generation dicamba-based weed control systems" and that the "new formulation work offers even further improvement in physical characteristics that result in better performance and safety to nearby crops." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

127.    In 2017, Monsanto represented that its "VaporGrip" technology "significantly minimizes dicamba's volatility potential after spraying – provid[ing] growers and applicators confidence in on-target application of dicamba." *Significant Reduction in Volatility Potential,* https://www.roundupreadyxtend.com/About/vaporgriptechnology/Pages/default.aspx (last visited Dec. 19, 2017).

128.    While also promoting Monsanto's Xtend seed technology in its own advertising, DuPont represents that FeXapan offers "Better Weed Management With Less Worry About Dicamba Volatility," using "a low-volatility dicamba formulation to add a needed mode of action to weed-control program while reducing potential for off-target herbicide movement from volatility" and providing for "excellent crop safety." Dupont Website http://www.dupont.com/products-and-services/crop-protection/soybeanprotection/products/fexapan.html (last visited January 1, 2018).

129.    BASF advertises and represents that "Engenia herbicide, with proper application, delivers an effective, on-target solution growers desperately need," promising "on-target herbicide application success with low volatility and drift, so the herbicide remains in place." BASF Website, http://agproducts.basf.us/campaigns/engenia/#stewardship (last visited January 2, 2018).

130.    Notwithstanding such assurances, XtendiMax, Engenia and FeXapan still are volatile.  In fact, no formulation reduces volatility in dicamba to a level at which it does not volatilize and move from the target application.  Indeed, any formulation that would eliminate volatility would make the herbicide ineffective.

131.    Even when sprayed properly, supposed "low" volatility, in-crop dicamba herbicides still can and do volatilize and become subject to movement in winds as low as 3 miles per hour.

132.    Field tests undertaken in 2017 also showed that volatility of the dicamba formulations sold by Monsanto, BASF and DuPont occurred over at least a 2-3 day period after application.

133.    Volatilization cannot be corrected with education or manner of spraying by the applicator.

134.    As to drift, and as described even by the EPA, the level of precaution necessary to prevent dicamba from moving off target is "extraordinary."  Tom Polansek, *Monsanto, BASF weed killers strain U.S. states with damage complaints* (Nov. 1, 2017), https://www.reuters.com/article/us-usa-pesticides-complaints/monsanto-basf-weed-killers-strain-u-s-states-with-damage-complaints-idUSKBN1D14N0.

135.    Label instructions were and are extraordinarily difficult if not impossible to follow.  For example, the XtendiMax instructions entailed at least four sources: a container label with instructions for use, a supplemental label, an ever-changing website, and local state-by-state directions.  Among other things, farmers were to spray only when winds were at least 3 miles per hour, but no more than 15 (now 10) miles per hour, significantly narrowing the window for timely application, particularly for farmers with many and/or geographically disbursed acres to spray.

The label also stated that XtendiMax should not be sprayed during a temperature inversion, a phenomenon difficult to predict.  It also must be sprayed no higher than 24 inches above the crops, using nozzles designed to produce coarse/ultra-coarse (larger) droplets.  There are restrictions on the pattern of the spray and the pounds per square inch of pressure.  Restrictions vary according to crop.

136.    At an August 8, 2016 Arkansas Pesticide Committee meeting, Boyd Carey from Monsanto acknowledged that "there are things [in the instructions] that are different than typical practices today." Arkansas Pesticide Committee Meeting Minutes (Aug. 8, 2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.

137.    For example, course/ultra-course nozzles, producing larger droplet size, generally are understood by farmers as detrimental to coverage.  The 24-inch boom height is lower that most farmers run their boom.  Speed of the sprayer, while affecting spray pressure, also affects the number of acres that can be covered in a given time span.  As one person attending an August 8, 2016 Arkansas Pesticide Committee Meeting said to Monsanto: "You're dealing with real people who have to fight the clock . . . We got guys with eight, 10,000 acres who have four planters, 30-foot long[,] 25 foot long because they have to plant it as quick as they can plant it because it's limited. They either lose their moisture or it turns to mud. That's what we're dealing with. We're not dealing with theory or drawing board things. That's why the problem with Dicamba is serious." *Id.*

138.    According to Dr. Bob Hartzler, Professor of Agronomy and Extension Weed Specialist for Iowa State University, restrictions in the XtendiMax label are "unlike anything that's ever been seen before." Tom Polansek & Karl Plume, *U.S. farmers confused by Monsanto weed*

*killer's complex instructions* (Aug. 21, 2017), https://www.reuters.com/article/us-usa-pesticides-labels/u-s-farmers-confused-by-monsanto-weed-killers-complex-instructions-idUSKCN1B110K.

139.     Larry Steckel is quoted as saying that "it's almost impossible" to follow label directions for the dicamba-based herbicides.  Dan Nosowitz, *Farmers Say It's Nearly Impossible to Follow Monsanto's Dicamba Directions*, (Aug. 25, 2017) https://modernfarmer.com/2017/08/farmers-say-nearly-impossible-follow-monsantos-dicamba-directions/.

140.     Steve Smith, a former member of Monsanto's dicamba advisory committee, testified at a congressional hearing that "[e]ven the best, the most conscientious farmers cannot control where this weed killer will end up."  Danny Hakim, *Monsanto's Weed Killer, Dicamba, Divides Farmers* (Sept. 21, 2017), https://www.nytimes.com/2017/09/21/business/monsanto-dicamba-weed-killer.html.

141.     At an August 8, 2018 Arkansas Pesticide Committee meeting, Duane Simpson from Monsanto acknowledged that application instructions were "going to take a lot of training, understanding, and respect to do this correctly." Arkansas Pesticide Committee Meeting Minutes (Aug. 8, 2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.  Yet, sufficient effective education and training were not provided.

***Dicamba Damage in 2017***

142.     In 2017, there were thousands of complaints of dicamba damage across the country. According to the EPA, over 3.6 million acres – about 4 percent of all soybeans planted in the United States – were damaged by dicamba in 2017 alone.

143.     Nationally, more than 2,000 dicamba-related injury investigations were conducted.

144.    A leading weed scientist, Dr. Kevin Bradley from the University of Missouri stated: "I've been doing this for more than 20 years now and I was around when Roundup Ready was introduced . . . In my opinion, this is nothing like the introduction of any trait or technology as far as the scope and the significance of the injury that's been observed across the U.S." He further stated: "I just don't think we know enough yet to apply [dicamba] safely." Eli Chen, *As harvest season begins, farmers worry how dicamba herbicide could affect next year's crop* (Sept. 19, 2017), http://news.stlpublicradio.org/post/harvest-season-begins-farmers-worry-how-dicamba-herbicide-could-affect-next-year-s-crop#stream/0.

145.    Dr. Bradley explained that the pattern of damage in most fields and the symptomology suggests that volatilization is to blame: "The majority of fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology . . . . This suggests problems with off-site movement through volatility." Michelle Cummings, *The Dicamba Dilemma*, Momentum, Fall 2017, at 13, https://view.joomag.com/momentum-fall-2017/0150973001508187562?page=13.

146.    Dr. Jason Norsworthy, Professor of Crop, Soil and Environmental Sciences for the University of Arkansas, told a task force of the Arkansas State Plant Board that he believed volatility was a "major cause of the issues" in 2017. Doug Rich, *Changes needed for dicamba formulations* (Sept. 25, 2017), http://www.hpj.com/crops/changes-needed-for-dicamba-formulations/article_61d06219-f796-5fbd-93e1-f789d923c541.html.

147.    Field experiments conducted by university researchers in the summer of 2017 also identified evaporating dicamba as the cause of the symptomology. Among other experiments, dicamba was sprayed into trays of soil at a remote location and then brought to and placed between

rows of soybeans covered with plastic. The dicamba evaporated from the trays and caused damage to surrounding soybeans.

148.    Dr. Rick Cartwright, a plant pathologist, University of Arkansas Extension administrator and Arkansas State Plant Board member, explained: "You apply [new dicamba formulations] to soybeans, and 36 hours later the product gets up and goes somewhere else. I don't know how you educate people to fix that." Greg D. Horstmeier, *Arkansas Sets Dicamba Limits* (Sept. 22, 2017), https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2017/09/ 22/plant-board-limits-herbicide-use-2.

149.    According to Dr. Bradley, all dicamba-based herbicides need to be kept "in the pre-plant, burndown, pre-emergence use pattern," and should not be used post-emergence, explaining that "the risk is too great for off-target movement" to be spraying it over the top of growing plants. David Bennett, *What's the latest on dicamba drift in Missouri?* (Sept. 1, 2017), http://www.deltafarmpress.com/soybeans/what-s-latest-dicamba-drift-missouri.

### Defensive purchasing of the dicamba-resistant trait

150.    Whether through volatilization or physical drift, a dicamba crop system has high risk of harm to farmers who grow susceptible non-dicamba resistant crops. As predicted, this would be a driver for sales of Monsanto's dicamba-resistant trait.

151.    It was foreseeable to, and expected by, Monsanto, BASF and DuPont that farmers would purchase seed containing the dicamba-resistant trait for defensive purposes, resulting in more and more demand due to fear of crop damage. And that is what occurred.

152.    As observed by the Center for Food Safety in comments before the Arkansas Plant Board, "[o]ne might think that the farmers' experiences over the past two years would generate a backlash against Monsanto's Xtend crop system . . . But unfortunately, precisely the opposite is

happening in this case."  Center for Food Safety, Comments on the Arkansas State Plant Board's Proposal to Restrict Dicamba Use at 34 (Oct. 30, 2017), http://www.centerforfoodsafety.org/files/cfs-dicamba-comments-for-arkansas--final-1_40098.pdf.

153.    Farmers have purchased and will continue to purchase the dicamba-resistant trait at higher prices for defensive purposes even if they are not otherwise interested in the base germplasm of the seed or dicamba resistance itself.

154.    Before the new supposed "low" volatility dicamba formulations were even on the market, weed scientists and others were warning that they too would result in damage to non-resistant crops, and farmers were expressing frustration and fear that they were "not going to be able to grow what they want to grow" but rather, "forced to go with that technology." Dan Charles, *How Monsanto And Scofflaw Farmers Hurt Soybeans In Arkansas* (Aug. 1, 2016), www.npr.org/sections/thesalt/2016/08/01/487809643/crime-in-the-fields-how-monsanto-and-scofflaw-farmers-hurt-soybeans-in-arkansas.

155.    As one farmer put it: "[Monsanto] knew that people would buy [Xtend] just to protect themselves, . . . You're pretty well going to have to.  It's a good marketing strategy, I guess. It kind of sucks for us."  Jack Kaskey & Lydia Mulvany, Bloomberg, *Creating a Problem – And a Lucrative Solution* (Sept. 5, 2016), http://cehn-healthykids.org/wp-content/uploads/2017/07/Bloomberg-buisness-week-sept-5-112016.pdf.

156.    Another farmer said he "got burnt so bad last year with dicamba on my beans," that he "planted all dicamba seed [in 2017] just for self-protection to keep from having that damage again" and "[m]ost everybody in my area did the very same thing that I did" even though the dicamba-resistant seed was more expensive.  Bryce Gray, St. Louis Post-Dispatch, *Weedkiller*

*dicamba unlocks record harvests — and a web of conflict among divided farmers* (Oct. 17, 2017), www.stltoday.com/business/local/weedkiller-dicamba-unlocks-record-harvests-and-a-web-of-conflict/article_fa3ba16e-10ef-5220-b1a0-71a84bcd7668.html.

157.    As summed up by another farmer: "You either get on board or get hurt." Bryce Gray, St. Louis Post-Dispatch, *'Get on board or get hurt': Missouri farmers wrestle with widespread dicamba damage* (Oct 22, 2017) http://www.theledger.com/news/20171022/get-on-board-or-get-hurt-missouri-farmers-wrestle-with-widespread-dicamba-damage.

158.    According to Dr. Bradley: "Every farmer I've visited with that's been injured . . . has said the same thing, and that is that next year they will plant the new trait—the dicamba resistant trait— to protect themselves. I hear that terminology over and over and over . . . That they aren't able to plant whatever they want to plant. And that they've got to plant a dicamba resistant soybean in the future so they don't get injured." Center for Food Safety, Comments on the Arkansas State Plant Board's Proposal to Restrict Dicamba Use, at 35 (Oct. 30, 2017), http://www.centerforfoodsafety.org/files/cfs-dicamba-comments-for-arkansas--final1_40098.pdf.

159.    "It's hard to think of a better example of bad behavior rewarded." *Id.* at 34-35.

160.    Monsanto was so confident in the expansion of the Xtend crop system that by 2015 it already had announced that it would invest almost $1 billion investment in a dicamba production facility.

161.    According to Enrique Wehlen, Monsanto's dicamba plant manager, when construction is completed, anticipated in mid-2019, the facility is expected "to supply 50 million pounds of dicamba product, a key component of the Roundup Ready Xtend Crop System." Louise Poirier, *$975 Million Expansion Underway at Monsanto's Luling Plant* (Feb. 28, 2017),

https://www.enr.com/articles/41538-975-million-expansion-underway-at-monsantos-luling-plant.

162. According to Monsanto Executive Vice President and Chief Strategy Officer Kerry Preete, this expansion "represents the single largest capital investment in Monsanto's self-manufacturing history." *Id.*

163. Other estimates from Monsanto are that the new plant is targeting 80M to 100M acres of capacity. *See* Monsanto Whistle Stop Tour "Accelerating the Future of Agriculture" Day 1 Session (Aug. 17, 2016), https://monsanto.com/app/uploads/2017/05/whistle_stop_viii_day-1-session_materials.pdf.

164. Monsanto now has agreements not only with DuPont but also with Syngenta to sell dicamba herbicide with Monsanto's "VaporGrip" technology.

165. Monsanto further is offering a cash-back incentive for farmers to use its XtendiMax herbicide in 2018, offering back $6 of the $11 per acre cost.

166. By some estimates, Monsanto amassed 20% of all U.S. soybean fields and 50% of all U.S. cotton fields in 2017, just two years after the initial launch of XtendFlex cotton in 2015. *See Latest Monsanto GMO seeds raises worries of monopoly* (Dec. 14, 2017), www.dailymail.co.uk/wires/afp/article-5178029/Latest-Monsanto-GMO-seeds-raises-worries-monopoly.html.

167. Monsanto plans more than 300 Xtend soybean varieties in 2018, as compared to 120 in 2017.

168. The increase in acres planted with Monsanto's Xtend technology was expected to be astronomical. As of January 2016, Monsanto was projecting that the "Industry's Largest Seed Technology Platform" with RR2 Xtend would reach 2/3 of all U.S. soybean acres by fiscal year

2019. *See* Monsanto Company First Quarter 2016 Financial Results (Jan. 6, 2016), https://monsanto.com/app/uploads/2017/05/2016.01.06_mon_q1f16_financial.pdf.    As of mid-2016, it was projecting a penetration in soybeans of 15 million acres in 2017, 55 million acres in 2019, with an 80 million target thereafter.    *See* Brett Begemann Presentation BMO Farm to Market Conference (May 18, 2019), https://monsanto.com/app/uploads/2017/05/2016.05.18_bmo_conference_begemann.pdf.

169.    By mid-2017, Monsanto had revised its projections, stating that RR2 Xtend soybeans were expected to reach 20M acres in the first year of the full system launch.    *See* Monsanto Company Third Quarter FY 2017 Earnings Conference Call Power Point Presentation (June 28, 2017), https://monsanto.com/app/uploads/2017/06/FINAL-DRAFT-Q3F17-Earnings-Slides-6-26-17/pdf.

170.    The number of soybean acres planted with Xtend technology alone rose from approximately 1 million acres in 2016 to more than 20 million acres in 2017.    Monsanto projects that this will double to more than 40 million acres in 2018, and 55 million acres in 2019.    Monsanto is targeting a penetration of more than 80 million acres in the U.S.    *See* Monsanto Fourth-Quarter FY2017 Earnings Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto.com/app/uploads/2017/10/MonsantoCo._Q4F17_Earnings_Presentation_2017.10.04.pdf.

171.    In 2017, the USDA reported a "record high" of 89.5 million acres of soybeans planted in the United States.    Even at that high level, Monsanto's target is near 100% of the entire United States soybean market.

172.    On information and belief, seed containing the dicamba resistant trait, whether sold by Monsanto or by others under license such as DuPont/Pioneer costs more than seed without it.

173.    Damage from dicamba to crops not genetically modified to resist it has and will continue to intimidate and pressure farmers to purchase Monsanto's dicamba-resistant trait whether they want it or not, suppressing competition and unlawfully creating and increasing demand by fear.

174.    The more crops planted with dicamba-resistant seed and the more dicamba sprayed after emergence of susceptible non-resistant crops, the more damage there will be and the more farmers will be forced to buy Xtend technology to protect themselves at higher cost.

175.    Farmers not only are coerced into buying the dicamba-resistant trait, but to get that trait, must purchase it along with the RR trait stacked with it.

176.    The behavior of Monsanto and its collaborators is anti-competitive, as it effectively suppresses and even eliminates competition, creating and increasing demand for Monsanto's trait based on fear, permitting and resulting in unlawful overcharge for seed containing that trait.

177.    Monsanto already controls large segments of the soybean and cotton markets, and has overwhelmingly dominant power in genetic traits for herbicide resistance.

178.    Monsanto holds the patent on the dicamba-resistant technology with sole control over who can access it, pricing, marketing, and promotion, including the ability to place restrictions and requirements on any other companies who might want to use the technology. Given that farmers have and will continue to need the technology for defensive purposes, Monsanto's market power is enormous and will only continue to grow.

179.    The relevant geographic market is all areas in the U.S. where susceptible crops, including soybeans and cotton, are grown.

180.    Plaintiff and members of the Class are direct purchasers of Monsanto's dicamba-resistant trait in soybean and/or cotton, harmed in their business or property by the anti-competitive

conduct of Monsanto alone and in concert with BASF and DuPont. All were harmed because they were unlawfully overcharged for seed containing Monsanto's dicamba-resistant trait.

181.    Plaintiff suffered crop damage to his soybeans in 2016 as the result of dicamba. In 2017, he purchased soybean seed with Monsanto's dicamba-resistant trait at higher price for defensive reasons to avoid further damage to crops not resistant to dicamba.

### Class Allegations

182.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of a class consisting of all persons and entities who, after 2015, purchased Monsanto's dicamba-resistant trait in soybean or cotton seed. Excluded from the Class are the Court and its officers, employees, and relatives; Defendant and its subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities.

183.    The "numerosity" requirement of Rule 23(a)(1) is satisfied because members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Although the exact number and identity of each Class member is not known, there are hundreds, if not thousands, of Class members.

184.    The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law and fact common to Plaintiff and other members of the Class. Among those common questions of law and fact are: whether Monsanto entered into one or more contracts, combinations or conspiracies regarding research, development, and promotion of a dicamba-based crop system with the intent and having the effect of damaging non-resistant crops and pressuring farmers to purchase seed containing the dicamba-resistant trait; whether Monsanto and its co-conspirators knew that their acts or omissions would cause or contribute to dicamba volatilization

and/or drift and damage to crops not planted with seed containing the dicamba-resistant trait; whether Monsanto has monopoly power in the relevant market and whether it acquired and maintains such power through anti-competitive conduct; whether there is substantial danger that Monsanto will acquire such monopoly power; and whether Plaintiff and members of the Class have been damaged in their business or property by reason of one or more anti-trust violations.

185.    Plaintiff's claims are typical of the claims of all other members of the Class because they arise from the same course of conduct by Monsanto, BASF and DuPont, and are based on the same legal theories as the claims of all other members of the Class. Moreover, Plaintiff seeks the same forms of relief for himself as on behalf of absent Class members. Accordingly, the "typicality" requirements of Rule 23(a)(3) are satisfied.

186.    Because his claims are typical of the Class, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or interests antagonistic to, other members of the Class relating to the claims set forth herein. Also, Plaintiff's commitment to the vigorous prosecution of this action is reflected in retention of competent counsel experienced in litigation of this nature to represent Plaintiff and other members of the Class. Plaintiff's counsel will fairly and adequately represent the interests of the Class and: (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation; (c) have extensive knowledge of applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the Class. Accordingly, the adequacy of representation requirements of Rule 23(a)(4) are satisfied.

187.    In addition, this action meets the requirements of Rule 23(b)(1). This case raises questions including those described above, requiring class wide adjudication to prevent the risk of inconsistent rulings and incompatible standards of conduct for Defendant. Moreover, absent a

representative class action, many members of the proposed Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be brought by individual producers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated producers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

188.    This action additionally meets the requirements of Rule 23(b)(3). Common questions of law and fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment permits large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damage to Class members is substantial in the aggregate, the damage to any individual member may be insufficient to justify individually controlling the prosecution of separate actions against Defendant.

189.    This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to members of the Class by first-class mail and through alternative means of publication and the Internet. Moreover, members' claims will be decided under federal substantive law and thus, the Court will not have to grapple with application of multiple jurisdictions' law.

190.    To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Plaintiff invokes Rule 23(c)(4) and reserves the right to seek certification of narrower and/or re-defined classes and/or to seek certification of a liability class or certification of certain issues common to the class. To the extent necessary for Rule 23(c)(4) certification, Rules 23(a) and 23(b) are satisfied. And resolution of particular common issues would materially advance the disposition of the litigation as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Combination in Restraint of Trade
### (Violation of Section 1 of Sherman Act)

191.    Plaintiff realleges and incorporates the allegations in Paragraphs 1- 190 as though fully set forth herein.

192.    Monsanto has engaged in unlawful and continuing contracts, combinations, and/or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

193.    Monsanto and BASF, and Monsanto and DuPont, entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and interstate commerce.

194.    BASF and DuPont, actual or potential competitors of Monsanto, joined with Monsanto to collaborate and conspire with the common unlawful objective to promote and sell a crop system featuring Monsanto's dicamba-resistant trait virtually certain to harm non-resistant crops susceptible to dicamba, including soybeans and cotton, with anti-competitive purpose and effect.

195.    BASF and DuPont benefit from their agreement, combination or conspiracy with Monsanto. Sales of Monsanto's dicamba-resistant trait benefit BASF's sales of Engenia; DuPont,

which until 2013 was competing and attempting to compete with Monsanto and claiming anti-trust violations vis-à-vis access to Monsanto's herbicide resistance technology, has, among other things, gained access thereto, including RR2 and dicamba-resistance, which it now uses in its own branded seed.   It also benefits through sales of FeXapan herbicide with Monsanto's "VaporGrip" technology.

196.    These companies' concerted action was intended to and does unreasonably restrain trade or interstate commerce.

197.    A farmer's access to dicamba resistance requires purchase of seed containing that trait, whether he is interested in the germplasm or other traits that might be stacked in that seed and regardless of higher price.

198.    Monsanto has dominant market power in herbicide-resistant traits, and as patent-holder, is the only developer with power over who has access to its dicamba-resistant trait, as well as the terms of its use.  Monsanto has power to raise prices significantly above competitive level and also to exclude competition.

199.    Moreover, Monsanto's conduct, together with BASF and DuPont, has produced and will continue to produce unlawful adverse effects on competition, including injury to competing crops grown with non-dicamba resistant seed, discouraging farmers from purchasing competing non-resistant seed, suppressing competition and depriving farmers of choice in what they purchase, as well as artificially high prices for seed containing the dicamba-resistant trait.

200.    As a direct and proximate result of Monsanto's conduct in violation of Section 1 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

201.    Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

## COUNT II
## Monopolization
## (Section 2 of the Sherman Act)

In addition to Count I, Plaintiff asserts this Count II for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

202.    Plaintiff realleges and incorporates the allegations in Paragraphs 1- 201 as though fully set forth herein.

203.    Monsanto possesses monopoly power in the relevant market of genetically engineered herbicide resistance, including resistance to dicamba.

204.    Monsanto has used its monopoly power to foreclose competition, gain a competitive advantage, or destroy competition.

205.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monsanto has willfully and unlawfully acquired, maintains and exercises this monopoly power by coercive, exclusionary and anticompetitive conduct as alleged herein, including development and promotion of a crop system virtually certain to harm competitor crops that are susceptible but not resistant to dicamba, enhancing Monsanto's long term ability to suppress or foreclose competition,  artificially increase demand, and reap the benefits of its monopoly power.

206.    Such behavior is without legitimate business purpose and makes sense only because it suppresses and eliminates competition.

207.    As a result of its willful and unlawful monopolistic conduct, Monsanto has maintained its monopoly or market power in the relevant market in which competition has been unlawfully reduced, eliminated or foreclosed.

208.    As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

209.    Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

### Count III
### Attempted Monopolization
### (Section 2 of Sherman Act)

In addition or in the alternative to Counts I - II, Plaintiff asserts this Count III for attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210.    Plaintiff realleges and incorporates the allegations in Paragraphs 1- 201 as though fully set forth herein.

211.    Monsanto has and continues to willfully engage in anticompetitive conduct as alleged herein, including promotion of a crop system that places competing non-resistant crops at great risk and improperly steers purchasers to its dicamba-resistant trait out of fear, in order to obtain a monopoly in the market for herbicide-resistant traits in all crops susceptible to dicamba, including cotton and soybeans.

212.    There is a dangerous probability of Monsanto's success, as demonstrated by Monsanto's own projections of Xtend sales.

213.    Monsanto has acted with the specific intent to monopolize, to control prices and/or suppress and destroy competition in the relevant market.

214.    As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

215.    Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

## COUNT IV
## Combination or Conspiracy to Monopolize
## (Section 2 of the Sherman Act)

In addition to Counts I - III, Plaintiff assert this Count IV for combination or conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

216.    Plaintiff realleges and incorporates the allegations in Paragraphs 1- 201 as though fully set forth herein.

217.    Monsanto, by its agreements and collaborations with BASF and DuPont, has engaged in a combination or conspiracy to monopolize and continue its monopolization of herbicide-resistant traits in the relevant geographic market.

218.    Monsanto has engaged in numerous overt acts in furtherance thereof including but not limited to those alleged in paragraphs 73-84, 90, 93-94, 99-101, 103-107, 116-23, 126-27, 141, 160-63 above.

219.    Monsanto acted with specific intent to monopolize as expressed through its actions to destroy competition and build monopoly.

220.    Monsanto's co-conspirators BASF and DuPont shared its specific intent to monopolize the market with dicamba-resistant trait.  Each benefits from such a monopoly as alleged herein.

221.    As a direct and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiff and the Class have been and will continue to be damaged, in amounts to be proven at trial.

222.    Plaintiff and the Class are entitled to treble the damages sustained, together with the cost of suit and reasonable attorneys' fee pursuant to 15 U.S.C. § 15.

**COUNT V**
**Negligence**

In addition to Counts I - IV brought for himself and others similarly situated, Plaintiff asserts this Count V individually for state-law negligence.

223.    Plaintiff realleges and incorporates the allegations in Paragraphs 1- 201 as though fully set forth herein.

224.    Monsanto recognizes its role as self-professed innovator and promoter of herbicides and crops genetically modified to withstand them.

225.    Monsanto pledges that it "places the highest priority on the responsible development, manufacture and use of crop protection products." *Product Stewardship and The Pledge*,  https://monsanto.com/products/product-stewardship/stewardship-pledge/ (last visited Dec. 19, 2017).

226.    Monsanto represents that it adheres to "the responsible development, management and use of technologies and products across our seeds, traits, and crop protection businesses through the entire product life cycle." *Product Stewardship*, https://monsanto.com/products/product-stewardship/ (last visited Dec. 19, 2017).

227.    According to Monsanto, "[s]tewardship is the shared responsibility of Monsanto and those who provide, handle and use our products . . . We want to ensure our products continue to be used properly. By following product life cycle stewardship processes, we stand behind our products from research and discovery to discontinuation and disposal." *Product Stewardship Safety*, https://monsanto.com/products/product-stewardship/product-stewardship-safety/ (last visited Dec. 19, 2017).

228.    Farmers are Monsanto's most immediate stakeholders.  Those with non-resistant crops susceptible to dicamba are the most likely to be harmed by Monsanto's irresponsible conduct.

229.    Discussing farmers' concerns over the dicamba damage, Monsanto described farmers as "the lifeblood of our company and our first priority."  Brian Naber, *Dicamba Field Investigations: What Monsanto Has Learned So Far* (July 21, 2017), https://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/.

230.    Monsanto knew that its commercialization, promotion, sale, and licensing of the dicamba-resistant seed trait would result in use of dicamba herbicide over the top of growing plants.  Monsanto developed the trait, sold and licensed it to others for this very purpose, which was intended and anticipated by Monsanto.

231.    Monsanto aggressively marketed a dicamba crop system knowing that dicamba could not be safely used in-crop and carries significant and serious risk to farmers growing crops not tolerant to dicamba.

232.    It was foreseeable, and in fact predicted, that farmers would spray dicamba in 2016 as a result of Monsanto's sale of dicamba-resistant seed.

233.    It was foreseeable that farmers like Plaintiff who grew susceptible non-resistant crops would be damaged by such spraying.

234.    Monsanto knew, and at minimum should have known, that conditions in Missouri, including temperature inversions, high levels of weeds and high levels of crops susceptible to dicamba, created high risk of dicamba damage whether from volatilization or physical drift.

235.    It was foreseeable to Monsanto, and highly probable, that injury to farmers growing susceptible non-resistant crops such as Plaintiff would occur.

236.   Monsanto had a duty of care to not create, or continue, an unreasonable risk of harm to Plaintiff.

237.   Because of the inherent and high risk of harm associated with dicamba, Monsanto had a duty to exercise the highest degree of care in its release, promotion, licensing and sale of a dicamba-resistant seed trait certain to encourage use of dicamba herbicide over the top of growing plants while susceptible non-resistant plants also are emerging and at risk.

238.   At a minimum, however, Monsanto had a duty to exercise ordinary care to exercise precaution commensurate with the dangers to be reasonably anticipated under the circumstances.

239.   Monsanto breached its duty of care.

240.   As a direct and proximate result, Plaintiffs were damaged.

241.   Monsanto's conduct showed a complete indifference to or conscious disregard of the rights of others, including Plaintiffs.  Punitive damages are thus warranted.

Respectfully Submitted,

By: /s/ Don M. Downing
**Gray, Ritter & Graham, P.C.**
Don M. Downing, #30405 MO
Gretchen Garrison #33963 MO
Jason Sapp #58511 MO
Kaitlin Bridges #60861 MO
Jack Downing #70034 MO
701 Market Street, Suite 800
St. Louis, MO 63101
Tel:  314-241-5620
Fax: 314-241-4140
ddowning@grgpc.com
ggarrison@grgpc.com
jsapp@grgpc.com
kbridges@grgpc.com
jdowning@grgpc.com